IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JIM A. YAHAYA, | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 10-5557 (JBS/KMW) |
| v. | : |  |
|  | : | **OPINION** |
| MAXIM HEALTH CARE SERVICES INC; JOHN DOE DECISION MAKERS (Plural 1-10; AND JOHN DOE OWNERS AND OPERATORS (Plural 1-10), | : |  |
| Defendants. | : |  |

APPEARANCES:

Latonya N. Bland, Esq.
LAW OFFICES OF RICHARD L. PRESS & ASSOCIATES, LLC
23 E. Black Horse Pike
Pleasantville, NJ 08232
     Attorney for Plaintiff Jim A. Yahaya

Carmen J. Dimaria, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
10 Madison Avenue, Suite 402
Moorestown, NJ 07960
     Attorney for Defendant Maxim Health Care Services, Inc.

**SIMANDLE**, Chief Judge:

## I.  INTRODUCTION

This matter is before the Court on the motion of Defendant Maxim Health Care Services, Inc. ("Maxim") for summary judgment. [Docket Item 29.]  Plaintiff Jim A. Yahaya ("Plaintiff" or "James Majeed") filed opposition.  [Docket Item 32.]

The instant action arises out of the Defendant's removal of Plaintiff from the work schedule and subsequent termination from

Maxim as a Home Health Aide.  The Plaintiff, who was born in
Ghana and lives in the United States, claims that he suffered
adverse employment actions because of his race and national
original in violation of the New Jersey Law Against
Discrimination, N.J.S.A. 10:5-1, et seq. ("NJLAD").  Defendant
Maxim argues it is entitled to summary judgment because the
evidence conclusively shows that Plaintiff was removed from the
work schedule as a Home Health Aide because he did not have a
valid Employment Authorization Card from the United States
Citizenship and Immigration Services ("USCIS").  Further, Maxim
argues it had legitimate, non-discriminatory reasons to terminate
the Plaintiff when he began making false statements about his
supervisors to other employees at Maxim.

The Plaintiff also brings a claim under the Consolidated
Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161, et
seq., alleging that Maxim failed to timely notify him of his
rights to extend health care coverage under COBRA when he was
terminated.  Maxim argues summary judgment is appropriate to
dismiss this claim because Plaintiff did not have health
insurance benefits at Maxim at the time of his termination.  The
Plaintiff argues that genuine issues of material fact exist which
prevent summary judgment.  Specifically, Plaintiff maintains that
he applied for health benefits a month prior to his termination
and therefore whether he was entitled to receive notice under

2

COBRA is a question for the jury.

Finally, Maxim argues that all claims against the fictitious defendants should be dismissed since discovery is complete and the Plaintiff has failed to name any of the John Does.  The Plaintiff does not oppose this aspect of Maxim's motion for summary judgment.

For the reasons discussed below, the court will grant Maxim's motion for summary judgment.  The court concludes that the Plaintiff has not raised a genuine dispute of material fact regarding his discrimination claim under the NJLAD.  In addition, the Plaintiff has not presented evidence from which a jury could find that he was receiving health benefits through Maxim at the time of his termination; therefore, he is not considered a covered employee under COBRA who is entitled to notice.  Finally, as the Plaintiff has not named his John Doe defendants and does not oppose summary judgment with regard to these fictitious parties, the court will dismiss these counts.

## II.  BACKGROUND

Plaintiff is a native of Ghana and has lived in the United States since 1988, becoming a Permanent Resident of the United States in 2009.  (Def.'s Ex. B and Pl.'s Ex. A, Deposition of Jim Majeed-Yahaya, January 20, 2012 ("Pl. Dep.") at 11:1-23.)  Plaintiff began his employment with Defendant Maxim in 2003 and worked as a Home Health Aide.  (Pl. Dep. at 22:1-12; 31:4-15.)

3

As a Home Health Aide, Plaintiff was responsible for assisting patients with various needs at the patient's home, including shaving and showering the patient, dressing the patient, cooking, cleaning, doing laundry and other daily living tasks.  (Pl. Dep. at 33:21-34:11; 37:15-20.)

Plaintiff worked primarily in Maxim's Atlantic County Northfield Office which was run by Robert "Bob" Moran from 2005 through Plaintiff's termination in 2008.  (Pl.'s Dep. at 28:21-30:21; 33:6-20.)  In addition to Bob Moran, the Northfield Office consisted of a head nurse and front office employees, including Amanda Andrilla, who worked primarily in Human Resources.  (Pl.'s Dep. at 35:20-25; 47:12-14.)  Amanda Andrilla began working with Maxim in 2005 or 2006, according to the Plaintiff.  (Pl.'s Dep. at 62:11-14.)

As a Home Health Aide, the Plaintiff would receive patient assignments based on his availability to work.  Specifically, the head nurse would receive patient assignments and instruct the front office to call Maxim's Home Health Aides to determine who was available to work the assignment.  (Pl.'s Dep. at 35:20-25.) It is unclear whether Bob Moran, the head nurse or the front office employees made the decision of which Home Health Aide was assigned to which patient.  (Pl.'s Dep. at 36:4-7.)  The front office employees gradually changed over the course of Plaintiff's employment with Maxim from 2003 to 2008 due to employee turnover.

(Pl.'s Dep. at 43:18-45:13.)

During his employment with Maxim, Plaintiff would typically see an average of four patients a day.  (Pl.'s Dep. at 34:25-35:3.)  From 2003 to Plaintiff's termination in 2008, Plaintiff was assigned to one patient in Stanley Holmes Village which is located in a poverty-stricken area.  (Pl.'s Dep. at 52:13-53:1.)  The Plaintiff could not recall how long he worked with this patient, but estimated that he spent approximately one to two months at this assignment around July 2008.  (Pl.'s Dep. at 51:24-52:19; 53:23-54:2.)  The front office employee who called Plaintiff about the Stanley Holmes Village assignment was Amanda Andrilla.  (Pl.'s Dep. at 55:14-17.)  While working on the assignment in Stanley Holmes Village, the Plaintiff was assigned to see other patients as well which were not located in poverty-stricken areas.  (Pl.'s Dep. at 60:12-6:8.)

The Plaintiff complained to Amanda Andrilla about working in Stanley Holmes Village and explained the conditions he observed and how he did not like working in the area.  (Pl.'s Dep. at 52:6-19.)  Plaintiff testified in his deposition that Amanda replied "that's what we have and that is part of the job, okay, you can drop that case, so I have to go ahead and do it."  (Pl.'s Dep. at 52:10-12.)  Plaintiff eventually stopped working the Stanley Holmes Village assignment after one to two months and the Plaintiff speculated that "something happened, you know, between

5

the clients and the office." (Pl.'s Dep. at 53:16-18.)  There is no evidence that Plaintiff was assigned to poverty-stricken areas again.

When receiving an assignment, Home Health Aides like the Plaintiff had the option of declining an assignment. (Pl.'s Dep. at 38:7-16.)  Plaintiff never declined an assignment and testified that it was because "if you turn a job down they don't usually, you know, like to call you, so you have to take whatever they say." (Pl.'s Dep. at 38:14-16.)

In addition to the Stanley Holmes assignment, Plaintiff had several other issues with Amanda Andrilla while working at Maxim. At some point between 2005 and 2008, the Plaintiff had an issue with his check because he did not receive payment for his overtime.  He spoke to Amanda about it and she responded by saying "I'm here working for Maxim, not working for someone like you." (Pl.'s Dep. at 14-19.)  Plaintiff testified during his deposition that he did not believe the check incident related to his race or national origin.  (Pl.'s Dep. at 119:8-18.)

Amanda Andrilla also told Plaintiff that she did not like the way Plaintiff talked and that "in America we don't speak like that." (Pl.'s Dep. at 115:15-16; 116:4-6.)  There is no evidence in the record of when these statements happened or in what context they were made.

Further, Amanda Andrilla worked primarily in the Human

Resources Department of Maxim and was responsible for verifying that Plaintiff had the proper work authorization card from United States Citizenship and Immigration Services ("USCIS").  To comply with federal immigration laws, an employer must verify that an employee is eligible to work in the United States.  (Def.'s Statement of Facts ¶ 15; Def.'s Ex. D, U.S. Dep't of Homeland Security Handbook for Employers.")  One acceptable form of employment eligibility verification is an Employment Authorization Card (Form I-766) issued by the USCIS.  (Def.'s Statement of Facts ¶ 16; Def.'s Ex. D.)  Once an Employment Authorization Card has expired, an employee can apply for an extension of his work authorization.  However, a receipt notice that the employee has applied for an extension of the Employment Authorization Card is not sufficient to establish eligibility to work in the United States.  (Def.'s Statement of Facts ¶ 18; Def.'s Ex. D.)  Specifically, the handbook issued by USCIS states: "A receipt indicating that an individual has applied for initial work authorization or for an extension of expiring work authorization is NOT acceptable proof of employment eligibility[.]..."  (Def.'s Ex. D at 6.)

Plaintiff worked at Maxim by presenting an Employment Authorization Card.  Each year, the Employment Authorization Card expired and it was Plaintiff's responsibility to renew it. (Pl.'s Dep. at 63:13-64:3.)  Plaintiff's card expired prior to

7

renewal twice while working at Maxim, first in 2007 and again in 2008.  In 2007, Plaintiff's Employment Authorization Card expired on August 10, 2007.  (Pl.'s Ex. C.)  Amanda Andrilla asked the Plaintiff about his card in 2007 but his card had expired.  The Plaintiff instead brought Amanda a "working number"[1] which, according to the Plaintiff, was acceptable in the previous years to Maxim and his other prior employers, but Amanda would not accept it.  Instead, she told the Plaintiff he needed to renew his card.  (Pl.'s Dep. at 68:19-69:14.)

A meeting was held on September 19, 2007 with Amanda Andrilla, Plaintiff, Craig Colardeau, a Maxim recruiter, and Jamie Recabo, Maxim's corporate attorney who participate via conference call, to address Plaintiff's expired Employment Authorization Card.  (Def.'s Reply Ex. D, Meeting invitation dated September 19, 2007; Def.'s Reply Ex. E, Email from Craig Colardeau to Amanda Andrilla re: James Majeed on September 19, 2007 at 3:23PM.)  At this meeting, it was found that Plaintiff was not eligible to work since his work authorization card expired.  Jamie Recabo concluded that although Plaintiff reapplied for his work authorization card in August, he would not be permitted to work until Maxim received his new authorization card or other acceptable documentation from immigration services.

---

[1] The Plaintiff did not explain in his deposition what a "working number" was and the parties did not explain this term in their brief.

(Def.'s Reply Ex. E.)  Consequently, Amanda Andrilla removed Plaintiff from the work schedule.  (Pl.'s Dep. at 68:18-69:24.)

Plaintiff testified that Mr. Recabo asked during the meeting if Plaintiff was given an employment number from Immigration and Plaintiff answered in the affirmative.  Plaintiff testified that Jamie Recabo put him back on the schedule after being shown the his I-797 receipt notice.  (Pl.'s Dep. at 71:2-21.)  Plaintiff testified in his deposition that he was put back on the schedule without having received his renewed Employment Authorization Card.  (Pl.'s Dep. at 71:17-24.)  The Plaintiff paid to renew his card on September 27, 2007 and was given a USCIS receipt number. (Pl.'s Ex. E.)  Plaintiff testified that he went to the Immigration Office with his receipt and an immigration officer wrote "Renewal Allowed to Work" on the paper and circled the telephone number for National Customer Service for Maxim to call with questions.  (Pl.'s Dep. at 75:15-76:16; Pl.'s Ex. E.)  The Plaintiff also testified that he gave this document to Maxim and this allowed him to be put back on the schedule.  (Pl.'s Dep. at 75:15-76:16.)

However, there is no evidence in the record that Plaintiff was assigned any patients until he received his renewed Employment Authorization Card in December 2007.  There is also no evidence in the record of any Maxim employee who was allowed to work with an I-797 receipt notice in lieu of a valid Employment

Authorization Card.  Thus, there is no evidence that Plaintiff
was treated in a disparate manner concerning the Employment
Authorization Card compared with others employed by the
Defendant.

Maxim's records indicate that the Plaintiff was taken off
the schedule on September 14, 2007 and was not put back on the
work schedule until December 5, 2007, after Plaintiff received
his new Employment Authorization Card.  (Def.'s Ex. L,
Plaintiff's Worker Schedule Report.)  Plaintiff's new Employment
Authorization Card was valid from November 20, 2007 through
November 19, 2008.  (Def.'s Ex. G.)

One year later, Plaintiff's card was expiring again.
Plaintiff applied to renew his Employment Work Authorization card
on September 19, 2008.  On September 22, 2008, Amanda Andrilla
reminded the Plaintiff that he was required to have a valid
Employment Work Authorization card to remain on the schedule.
(Def.'s Reply Ex. F, Sept. 22, 2008 Worker Logging Report entry;
Pl.'s Dep. at 78:3-16.)  On September 26, 2008, Plaintiff was
issued an I-797 receipt notice by USCIS which evidenced that he
had applied to renew his Employment Authorization Card.  (Pl.'s
Dep. at 80:4; Def.'s Ex. H.)  Plaintiff provided a copy of this
form to Amanda.  (Pl.'s Dep. at 80:1-19.)  At the bottom of the
I-797C form, it states:

> This receipt notice provides notification of the date
> that your application/petition was received by USCIS.

10

> This receipt notice does **NOT** grant any immigration status
> or benefit.  You may not present this receipt notice as
> evidence that you have been granted any immigration
> status or benefit.

(Def.'s Ex. H, I-797C Notice of Action, September 26, 2008.)  At

the time Plaintiff received the I-797 receipt notice, his

Employment Authorization Card had not yet expired and so he

continued to work at Maxim.  (Def.'s Ex. G.)

On November 12, 2008, Amanda Andrilla contacted via email

Craig Kile, Maxim's Human Resources Manager, to inquire about

Plaintiff's ability to work if his Employment Authorization Card

expired.  Specifically, Amanda stated in her email to Craig:

> One of our employees (James Majeed's) work authorization
> card expires next week on 11/19/08.  We had a big issue
> with him last year because he did not get a new card by
> the expiration date and we had to get legal involved.  He
> has given me his receipt notice but it is my
> understanding that document can not serve in place of the
> actual work authorization card.  I wanted to double check
> with you prior to pulling him from any shifts due to
> legal issues.  Can you please confirm either way.  Also,
> if I need to contact legal, please let me know.

(Def.'s Ex. E, Email from Amanda Andrilla to Craig Kile, November

12, 2008 at 9:14AM.)

Craig Kile forwarded this email to other colleagues in Human

Resources and ultimately, Sharon Smith, a Sr. Human Resources

Generalist, responded.  Sharon clarified that:

> The "receipt rule" does not apply to individuals who
> present receipts for renewal of employment authorization.
> This person will need to be pulled until the new document
> is received.  If the person has other acceptable
> documentation that shows identity and employment
> eligibility . . . He/she can continue to work, however,

an updated I-9 would need to be completed, specifically Section 3; Line C.

<u>Id.</u> Prior to responding, Sharon Smith contacted Maxim's legal department and verified that a person could not work without a valid Employment Authorization card. (Dep. of Sharon M. Smith, February 16, 2012 ("Smith Dep.") at 41:18-25; 69:2-19.) Sharon Smith testified in her deposition that she had the authority to decide whether Plaintiff should be removed from the schedule and that Amanda did not have the authority to decline Smith's decision. (Smith Dep. at 41:1-22.)

On November 19, 2008, Plaintiff's Employment Work Authorization Card expired and Amanda Andrilla pulled Plaintiff from the schedule and would not allow him to work. (Pl. Dep. at 85:21-23; 86:6-10; 95:17-19.) However, Plaintiff was not told at that time that his employment was terminated. (Pl. Dep. at 95:14-16.) Rather, at the time Plaintiff was removed from the work schedule, the intention was to have Plaintiff return to work once he could produce a valid Employment Authorization Card. (Smith Dep. at 64:5-16.)

Plaintiff asked Amanda Andrilla to speak to someone in the corporate counsel's office after she informed him he was pulled from the schedule. Amanda told the Plaintiff he was removed because his card had expired and that she could not put Plaintiff back on the schedule without talking to Sharon Smith first. (Pl. Dep. at 86:2-23.) Amanda Andrilla refused Plaintiff's request to

speak to the corporate counsel's office and said "don't tell me how to do my job." (Pl. Dep. at 17-23.)

After Plaintiff was removed from the schedule, he called Sharon Smith and told her that she should instruct Amanda Andrilla to put him back on the schedule. (Pl.'s Dep. at 87:20-88:5.) Plaintiff received Sharon Smith's number from Amanda Andrilla. (Pl. Dep. at 88:17-20.) Plaintiff urged Sharon Smith to talk to the corporate counsel who handled the situation in 2007 and explained to Sharon that he should be able to work with his receipt notice. (Pl. Dep. at 89:20-90:6.) Plaintiff testified that he was not upset or angry during this phone call, "but I was fighting, I was making her understand. . . ." (Pl. Dep. at 90:21-22.) In contrast, Sharon Smith characterized her conversation with the Plaintiff as challenging and rude and explained that Plaintiff "was interruptive, he was loud, he wouldn't accept any of my conversation, very – you know, he would talk over me." (Smith Dep. at 95:11-15.)

After speaking with Sharon, Plaintiff called Amanda to "tell her do you know we've been to the same situation before. . . . I was trying to make her remember, okay, what happened but she just insist, okay, you're not going to be on the schedule." (Pl.'s Dep. at 91:11-20.) Amanda told the Plaintiff that she was tired of talking about the situation and "if you keep talking I'm going to hang up." (Pl.'s Dep. at 91:25-92:1.) Amanda eventually hung

up on the Plaintiff.  Id.

Plaintiff then tried to call Sharon Smith again but was not successful in getting through to her personally.  (Pl.'s Dep. at 92:13-20.)  Plaintiff continued to call Sharon and Amanda consistently about being placed back on the schedule.  (Pl.'s Dep. at 92:23-93:12; 97:4-14.)

Plaintiff also went in personally to the office to talk to Amanda on several occasions.  (Pl.'s Dep. at 93:13-15.)  Plaintiff insisted that he should be allowed back to work.  (Pl. Dep. at 102:6-19; 103:14-104:3.)  The Plaintiff also spoke to Bob Moran about getting put back on the schedule.  (Pl.'s Dep. at 98:16-99:1; 103:12-13.)  Plaintiff, however, was not put back on the schedule.

One day, when the Plaintiff was at the office but not on the work schedule, the Plaintiff overheard Amanda Andrilla speaking with a new nurse, Rosalyn, about the Plaintiff.  Rosalyn worked briefly with the Plaintiff and did not get along well with the Plaintiff.[2]  The Plaintiff overheard Amanda and Rosalyn talking

---

[2] Specifically, Plaintiff and Rosalyn worked together on an assignment.  During the assignment, Rosalyn went through the client's file in their home and the client's daughter got angry and threatened to call Maxim's office.  The Plaintiff calmed the client's daughter and called Maxim's office himself to report Rosalyn's behavior.  After this incident, Rosalyn did not get along with the Plaintiff.  (Pl.'s Dep. at 121:6-25.)  Plaintiff testified that this situation with Rosalyn did not have anything to do with Plaintiff's race or national origin.  (Pl.'s Dep. at 122:1-5.)

about who had really hired the Plaintiff and how long he had been
working at Maxim and they said "I can't stand him" referring to
the Plaintiff.  (Pl.'s Dep. at 120:2-8.)  Plaintiff then
confronted both Amanda and Rosalyn and said if they have an issue
with him, they should discuss it with Bob.  (Pl.'s Dep. at 120:9-
16.)  Plaintiff's race or national origin was not mentioned
during this conversation.

At some point after he was taken off the schedule, Plaintiff
received his new Employment Authorization Card, which was valid
from November 26, 2008 through November 25, 2009.  (Def.'s Ex.
R.)  Plaintiff does not recall when he received this card.
(Pl.'s Dep. at 108:21-109:1.)  However, when he received it,
Plaintiff took it to the office and had the office staff make a
copy of it.  (Pl.'s Dep. at 106:24-107:10.)  On December 11,
2008, Plaintiff faxed the new Employment Authorization Card to
Bob Moran.  (Pl.'s Dep. at 98:4-99:4.)  Plaintiff did not think
he gave a copy of the card to Amanda.  (Pl.'s Dep. at 109:25-
110:4.)  Plaintiff was not put back on the work schedule at this
time.

On January 6, 2009, Plaintiff sent a letter to Bob Moran
complaining about Amanda Andrilla, about not being able to return
to work and also stated that he believed that he was being
discriminated against.  (Pl.'s Ex. D.)  The Plaintiff did not
state in this letter that he felt he was being discriminated

15

against because of his race or national origin.  Instead, the

letter addresses Plaintiff's frustration with Amanda and

Rosalyn's conversation about him as well as Plaintiff's struggles

with Amanda to get back on the schedule.  Plaintiff explained in

the letter that when he talked to Sharon at corporate:

> Sharon seemed not have any idea about what went on
> before.  Sharon didn't even have a copy of my receipt of
> notice until faxed I one to her.  Sharon didn't even know
> the date on my card had expired and she was not notified
> about it.  Amanda lied and withheld the truth.

(Pl.'s Ex. D at 2.) The Plaintiff concluded the letter by saying

that Amanda "did not confirm with our Legal Department before

putting me out of work.  Amanda is wicked, hateful and cruel and

did this intentionally.  This whole situation all comes down to

one word: discrimination."  (Pl.'s Ex. D at 2.)

On January 21, 2009, Amanda Andrilla sent an email to Sharon

Smith advising her that Plaintiff had received his renewed

Employment Authorization Card.  Specifically, Amanda stated:

> I am not sure if there has been some type of
> misunderstanding regarding James Majeed . . . . I was
> told he was not able to work with a receipt notice.
>
> . . .
>
> Since then, this employee has received a new employment
> authorization card and would like to come back to work.
> Unfortunately, I had a hard time dealing with James
> because he keeps saying that you told him I was not
> supposed to pull him from work.  He has also told my
> DOCS, AM and other recruiters in my office that you told
> him our office did the wrong thing and that I was not
> authorized to stop him from working.  I am not sure if I
> misunderstood something regarding your response to his
> receipt notice.  I just want to make sure we are on the

same page, and I want to make sure I understand the regulations regarding employment authorization. I would hate to have to go through this again.

(Def.'s Ex. E.)

Sharon Smith responded the same day and replied:

Quite the contrary. I informed James that according to the regulations that I referenced he was not eligible to work with a receipt. He insisted that I was wrong and I encouraged him to have his attorney call me to discuss and give me clarification . . . . If he has the proper authorization to work then you can schedule him, however, I would have concerns over his false statements that he is making to you and the office.

(Def.'s Ex. E.)  Plaintiff contests that he ever made a false statement regarding Sharon and Amanda. (Pl.'s Dep. at 104:16-105:12.)

Later that same day on January 21, 2009, the decision was made not to rehire the Plaintiff and was documented in a Worker Logging Report. (Def.'s Ex. I.)  The Plaintiff was deemed ineligible for rehire because of "James' false statements and accusations." (Def.'s Ex. I.)  It was noted in the log that the Plaintiff called Amanda multiple times and accused her of doing the wrong thing by removing him from the schedule and it was noted that Plaintiff got very loud over the phone and would not let Amanda speak and hung up on her.  It was also noted that Plaintiff accused Amanda of "taking away his rights by not letting him work." (Def.'s Ex. I.)  In addition, the log mentioned that Plaintiff missed appointments to come by the office to fill out paperwork in order to update his requirements

17

for the position.  Id.

At the time Plaintiff was terminated, he was not enrolled in Maxim's healthcare plan.  At no time during his employment did Plaintiff receive the health benefits that Maxim offered. (Affidavit of Beverly Hardin, Benefits Manager of Maxim, ¶ 4.) The Plaintiff testified during his deposition that he signed a document "for a health benefit" a month prior to his termination; however the Plaintiff has produced no documentation regarding this application.  (Pl.'s Dep. at 114:16-115:2.)  After the Plaintiff was terminated, he did not receive any notice of health benefits under COBRA.

Maxim had a detailed Equal Opportunity Policy and anti-harassment policy which was outlined in Maxim's employee handbook.  (Statement of Facts ¶¶ 63-66.; Def.'s Ex. K at 5-6.) This policy provided that employees who felt they suffered from discriminatory treatment or harassment should contact the Human Resources Department or, an employee could contact Maxim's President directly.  Id.  The Plaintiff never reported to anyone at Maxim that he felt he was being discriminated against because of his race or national origin.  The only complaint Plaintiff filed was his letter to Bob Moran on January 6, 2009, and this letter does not mention that Plaintiff felt he was being treated differently due to his race or national origin.

Plaintiff testified during his deposition that he felt that

18

he was discriminated against on the basis of his national origin because Amanda Andrilla was nice to other employees but was very hostile toward him and would hang up on him when they were on the phone.  (Pl.'s Dep. at 116:20-117:12.)  Similarly, Plaintiff testified that he felt he was discriminated based on his race because "I never see anybody going in the same situation that I was going with Ms. Andrilla in the office."  (Pl.'s Dep. at 128:7-9.)

After Plaintiff was terminated, he filed the instant action against Defendant Maxim alleging that he was discriminated against because of his race and national origin in violation of the NJLAD.  The Plaintiff also brought a claim under COBRA alleging that Maxim violated the notice requirements regarding his health benefits.

The period for factual discovery concluded, and the Defendant then filed the instant motion for summary judgment.

## III.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. The Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party. Hunt v. Cromartie, 526 U.S. 541, 552 (1999). See also Scott v. Harris, 550 U.S. 372, 378 (2007) (The district court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.").

**B. NJLAD Claim**

The NJLAD makes it unlawful for an employer to discriminate against an employee on the basis of an employee's race or national origin. As a result of the inherent "difficulty of proving discriminatory intent," the New Jersey Supreme Court adopted the *McDonnell Douglas* burden-shifting framework to analyze whether an employer engaged in unlawful discrimination when there is only circumstantial evidence of such discrimination. Zive v. Stanley Roberts, Inc., 182 N.J. 436, 446-47 (2005); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under the *McDonnell Douglas* test:

> (1) the plaintiff must come forward with sufficient
> evidence to constitute a prima facie case of
> discrimination; (2) the defendant then must show a
> legitimate non-discriminatory reason for its decision;
> and (3) the plaintiff must then be given the opportunity
> to show that defendant's stated reason was merely a

20

pretext or discriminatory in its application.
Dixon v. Rutgers, The State Univ. of N.J., 110 N.J. 432 (1988).

A plaintiff's evidentiary burden in establishing a prima facie case is "rather modest:  it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent - i.e., that discrimination *could* be a reason for the employer's action." Zive, 182 N.J. at 447. However, if an employer comes forward with admissible evidence of a legitimate, non-discriminatory reason for its adverse employment action, the presumption of discrimination disappears and the burden of production shifts back to the plaintiff. Bergen Commer. Bank v. Sisler, 157 N.J. 188, 211 (1999.)  The plaintiff employee must then show by a preponderance of the evidence that the reason given by the employer was pretext for discrimination by demonstrating "that the employer's reason was both false and motivated by discriminatory intent." Henry v. New Jersey Dept. of Human Services, 204 N.J. 320, 331 (2010). "Although the burden of production shifts throughout the process, the employee at all phases retains the burden of proof that the adverse employment action was caused by purposeful or intentional discrimination." Sisler, 157 at 211.

In order to satisfy the first step of the *McDonnell Douglas* test, the plaintiff must show the following four elements to establish a prima facie case for discrimination under the LAD:

(1) that he is a member of a protected group; (2) that he was qualified for a position and was performing his job at a level that met the employer's legitimate expectations; (3) that he was subjected to an adverse employment action; (4) under circumstances that give rise to an inference of unlawful discrimination. <u>Shah v. State of Wisconsin</u>, No. 11-0419, 2011 WL 5192127, *6 (D.N.J. October 31, 2011); <u>Young v. Hobart West Group</u>, 385 N.J. Super. 448, 464 (App. Div. 2005).

In this case, the Plaintiff claims he suffered from three separate adverse employment actions. First, the Plaintiff maintains he was assigned to a patient in a poverty-stricken area because of his race and national origin. Second, the Plaintiff claims he was unlawfully removed from the work schedule in 2008 because of his race and national origin. Finally, the Plaintiff claims he was terminated in 2009 rather than placed back on the work schedule because of his race and national origin. The court will address each of these adverse employment actions separately.

First, the court finds that the Plaintiff cannot establish a prima facie case based on his assignment to a patient in Stanley Holmes Village. This was the only patient Plaintiff was assigned to who was located in a poverty-stricken area. The Plaintiff worked for Maxim from 2003-2008 and saw on average four patients a day. The Plaintiff's assignment to one patient in an area not to his liking throughout his five years of employment does not

give rise to an inference of discrimination.  Further, Plaintiff's assignment to this patient was of short duration and lasted at most two months.

The Plaintiff complained to Amanda Andrilla about his assignment to Stanley Holmes Village, and while Amanda Andrilla responded that his assignment to this area is "what we have and that is part of the job," this does not give rise to an inference of unlawful discrimination based on Plaintiff's race or national origin.  First, Plaintiff's race and national origin was not mentioned during this conversation.  The Plaintiff has come forward with no evidence to show that other Home Health Aides of different races or national origins were treated differently with regard to assignments.  In addition, the Plaintiff admitted in his deposition that the only employee he complained to about the condition of Stanley Holmes and his displeasure with the assignment was Amanda Andrilla.[3]  At most, two months later, the Plaintiff was removed from Stanley Holmes because according to the Plaintiff "something happened, you know, between the clients and the office." (Pl.'s Dep. at 53:16-18.)  As Amanda Andrilla, by Plaintiff's own admission, was the only office member made

---

[3] Plaintiff testified in his deposition that he went to talk to Bob Moran twice about his assignment to Stanley Holmes Village and both times "Bob wasn't in the office and as time goes I just, you know, forget about it, but I wanted to talk to Bob about it." He went on to say he dropped the issue and did not talk to anyone else besides Amanda about the assignment.  (Pl.'s Dep. at 59:9-23.)

23

aware of the poor conditions at Stanley Holmes, the only reasonable inference is that Amanda took some action to address Plaintiff's concerns, which ended his assignment to that client. Far from discrimination, these facts give rise to an inference that the Plaintiff's concerns were heard and his problem was addressed by Maxim.  Therefore, the Plaintiff has not established a prima facie case with regard to his assignment to a patient in Stanley Holmes Village.

Next, Plaintiff argues he suffered an adverse employment action by being removed from the schedule in 2008 when his Employment Authorization Card expired.  It is undisputed by the parties that Plaintiff's Employment Authorization Card expired on November 19, 2008 and he had not yet received his new card.  It is also undisputed by the parties that the Plaintiff was not eligible to work in the United States with merely an I-797C receipt notice.  This form says in bold print: "This receipt notice does **NOT** grant any immigration status or benefit."  The Plaintiff has put forth no legal authority to the contrary. Therefore, it is clear that the Plaintiff was no longer qualified for his position once his Employment Authorization Card expired since he could not legally work in the United States. Consequently, the Plaintiff cannot establish the second element of his prima facie case with regard to this adverse employment action.

Finally, the Plaintiff claims that Maxim terminated him after he received his renewed Employment Authorization Card instead of reinstating him to the work schedule because of his race and national origin.  At this point, the Plaintiff was a member of a protected class and qualified for his position and suffered the adverse action of termination.  The Plaintiff has put forth sufficient evidence to meet his modest burden "that discrimination *could* be a reason for [Maxim's] action."  <u>Zive</u>, 182 N.J. at 447.

Specifically, the Plaintiff has put forth evidence that Amanda Andrilla stated at some point to the Plaintiff that she did not like the way he talked and that "in America we don't speak like that."  However, it is unclear when these comments were made and in what context.  The Plaintiff has also shown that he faxed Bob Moran a copy of his renewed Employment Authorization Card on December 11, 2008 and that he was still not reinstated on the work schedule.  The Plaintiff has also shown that the decision to terminate the Plaintiff was made on January 21, 2009, more than a month after he presented his new work authorization card and on the same day Amanda Andrilla emailed Sharon Smith about Plaintiff's allegedly false statements.  This is sufficient to meet the fourth element of Plaintiff's prima facie case and establishes circumstances which give rise to unlawful discrimination.

The burden of production now shifts to Maxim and Maxim has produced admissible evidence of non-discriminatory reasons for Plaintiff's termination.  In particular, Maxim has produced Amanda Andrilla's work log which states several reasons for Plaintiff's termination including that the Plaintiff called her multiple times and accused her of doing the wrong thing by removing him from the schedule; that Plaintiff got very loud over the phone and would not let Amanda speak and hung up on her; that Plaintiff accused Amanda of taking away his rights by not letting him work; that Plaintiff missed appointments to come by the office to fill out paperwork in order to update his requirements for the position; and that the Plaintiff made false statements and accusations against her.

Maxim also produced the deposition transcript of Sharon Smith which characterized Plaintiff in her discussions with him as rude and challenging.  In particular, Smith testified that the Plaintiff "was interruptive, he was loud, he wouldn't accept any of my conversation, very – you know, he would talk over me." (Smith Dep. at 95:11-15.)

Finally, Maxim produced email exchanges between Amanda Andrilla and Sharon Smith regarding Plaintiff's belligerent behavior while off the work schedule and whether Plaintiff should be rehired.  Plaintiff's race and national origin were not mentioned in any of these exchanges.  Maxim's contemporaneous

documents and witness testimony clearly supply non-discriminatory reasons for terminating Plaintiff.

Since Maxim has satisfied its burden of production showing legitimate non-discriminatory reasons for Plaintiff's termination, the presumption of discrimination disappears and the burden of persuasion is now on the Plaintiff to show that Maxim's articulated reasons are false and a pretext for discrimination. The Plaintiff has failed to meet this burden and cannot establish unlawful discrimination under the LAD.

First, the Plaintiff claims he never made any false statements to Amanda or other employees regarding his removal from the schedule and Maxim's assertion that he did make these statements is pretext.  Specifically, the Plaintiff maintains that Amanda Andrilla's email to Sharon Smith stating that the Plaintiff told Amanda that Sharon said not to pull him from work is false.  The Plaintiff also asserts Amanda's claims in the email that the Plaintiff told other managers and employees in the office that she did the wrong thing and was not authorized to pull him from the schedule is false.

Plaintiff's current arguments that he did not make false statements regarding his removal from the schedule to employees and managers at Maxim is contradicted by his own letter to Bob Moran on January 6, 2009.  The Plaintiff stated in his letter to Bob Moran that when he spoke with Sharon Smith, "Sharon didn't

even know the date on my card had expired and she was not
notified about it.  Amanda lied and withheld the truth."  This is
false because Plaintiff himself testified in his deposition that
Sharon Smith knew about his expired card and told him he could
not work.  Plaintiff stated that "I was fighting, I was making
her understand. . . ."  (Pl. Dep. at 90:21-22.)  The Plaintiff
testified in his deposition that Sharon Smith went so far as to
tell the Plaintiff to have his attorney contact the corporate
office if needed.  If, as Plaintiff claimed in his letter to Bob
Moran, Sharon was never notified about Plaintiff's expired work
card, there would be no reason for Sharon to refer Plaintiff to
the corporate attorney or speak with Plaintiff over the phone
about removing him from the schedule.  Clearly, Plaintiff's
claims to Bob Moran that Amanda lied to Sharon about Plaintiff's
expired work authorization card and never notified Sharon about
the situation constitute false accusations and are a lawful, non-
discriminatory basis for Plaintiff's termination.

   In addition, Plaintiff's January 6, 2009 letter does not
mention that Plaintiff felt he was being discriminated against on
the basis of his race or national origin.  Plaintiff boldly
states that "Amanda is wicked, hateful and cruel and did this
intentionally" but never complains that Amanda removed him from
the schedule because he is African and from Ghana.

   Plaintiff's sole evidence that Amanda Andrilla discriminated

against him because of his race are two comments made at some point between 2005 when Amanda was hired and Plaintiff's termination in 2008.  The first comment is that Amanda did not like the way Plaintiff talked.  The second comment is that Amanda told the Plaintiff, "In America we don't speak like that."  The Plaintiff has produced no evidence regarding when these comments occurred and the context in which these comments were made.  Consequently, this is insufficient to show that Maxim intentionally discriminated against the Plaintiff when he was terminated.

Assuming *arguendo* that Amanda Andrilla's comments referred to Plaintiff's accent, this alone does not establish unlawful discrimination on the basis of race or national origin.  Both parties rely on Collins v. Beauty Plus Trading Co., Inc., No. L-1196-08, 2012 WL 967596 (N.J. App. Div. March 23, 2012) in analyzing the significance of Andrilla's statement that she did not like the way Plaintiff talked and that "in America we don't speak like that."  In Collins, the New Jersey Appellate Division explained:

> "Language, by itself, does not identify members of a suspect class." Soberal-Perez v. Heckler, 717 F.2d 36, 41 (2d Cir.1983). However, it is conceivable that disparate treatment because of one's language could be related to race or national origin discrimination. See Garcia v. Gloor, 618 F.2d 264, 268 (5th Cir.1980) (providing "[l]anguage may be used as a covert basis for national origin discrimination").

Collins, 2012 WL 967596 at *5.  The Collins court went on to hold

that an employer's use of the Korean language did not constitute
unlawful discrimination against the employee's African American
race because "nothing links the defendant's use of their native
language to plaintiff's race."  Id.

It is well established that "stray remarks by decision-
makers, which were unrelated to the decision-making process, are
rarely to be given weight, particularly if they are made
temporally remote from the date of the decision."  Does v.
C.A.R.S. Prot. Plus, 527 F.3d 358, 368 (3d Cir. 2008).

In this case, the Plaintiff has produced no evidence linking
Amanda Andrilla's comments to Plaintiff's African race or
Ghanaian nationality.  In addition, the Plaintiff has produced no
evidence demonstrating a nexus between these remarks and the
decision to terminate his employment.  The Plaintiff has provided
no context and no time period for these comments and without
more, these comments do not show that Maxim intentionally
discriminated against the Plaintiff on the basis of his race or
national origin.

Also, the court notes that Amanda Andrilla was not
Plaintiff's supervisor and did not have the authority to remove
him from the work schedule or terminate him.  Instead, the record
before the court indicates that Sharon Smith was the manager with
authority to remove Plaintiff from the work schedule and
terminate him.  The Plaintiff has produced no evidence of

discriminatory remarks made by Sharon Smith or evidence that Amanda Andrilla made discriminatory remarks about the Plaintiff to Sharon Smith or any other supervisor.

Similarly, Amanda Andrilla's comment that she "can't stand [the Plaintiff]" which was made to another nurse is insufficient to rise to the level of discrimination.  Interestingly, this conversation was candid and accidentally overheard by the Plaintiff.  There is no evidence that any discriminatory remarks about Plaintiff's race or national origin were made.  Rather, these comments show Amanda and nurse Rosalyn's general dislike of the Plaintiff and nothing more.  In addition, these comments were not made to a supervisor of the Plaintiff's and were made more than six months before the Plaintiff was terminated and cannot be deemed evidence of discrimination.

Finally, the court notes that the Plaintiff's work authorization card expired previously in 2007 and Plaintiff was not assigned to patients again until he presented his renewed authorization card.  Plaintiff was hired back in 2007 and Amanda Andrilla was involved with reinstating Plaintiff to the schedule. There is no evidence in the record that the Plaintiff was treated unlawfully in 2007 due to his race or national origin.

However, in 2008, Plaintiff again failed to renew his authorization card in a timely fashion and it expired.  Plaintiff was then removed from the schedule and according to his own

31

admission consistently called Amanda and Sharon and personally
visited the office on numerous occasions.  None of the management
had changed between 2007 and 2008.  However, according to the
record, Plaintiff's response to the situation changed and he
became insistent and at times belligerent.  Maxim claims it
terminated the Plaintiff due to his false statements and
accusations, his inability to timely file paperwork and his rude
behavior while off the schedule.  The record supports these
reasons and the Plaintiff has offered no evidence to rebut these
legitimate, non-discriminatory reasons for Plaintiff's
termination.

Consequently, no rational jury could find that the Plaintiff
was unlawfully discriminated against because of his race or
national origin and no genuine issues of material fact exist
which prevent summary judgment as to Plaintiff's NJLAD claim.

In its motion for summary judgment, Maxim argues that to the
extent Plaintiff alleges a hostile work environment under the
LAD, this claim too should be dismissed.  The Plaintiff did not
address any hostile work environment claim in its opposition
brief and the court is satisfied that the Plaintiff's complaint
clearly pleads discrimination under the NJLAD and not a claim for
hostile work environment.  Even if the court were to consider the
merits of a hostile work environment claim, the Plaintiff has not
presented evidence to support such a claim.

32

In order to establish a hostile work environment claim under the NJLAD on the basis of race or national origin, an employee must establish that the defendant's conduct: (1) would not have occurred but for the employee's race or national origin; and the conduct was severe or pervasive enough to make a (3) reasonable person of plaintiff's race or national origin believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.  Taylor v. Metzger, 152 N.J. 490 (1998).

The Plaintiff has presented no evidence that Maxim's conduct towards him was so severe or pervasive that a reasonable employee of Plaintiff's race and national origin would have believed the work environment was hostile.  At most, the Plaintiff has shown that Amanda Andrilla did not like the Plaintiff and according to the Plaintiff, she treated others at the office more favorably by smiling more.  Aside from the incidents discussed supra which do not constitute violations of the NJLAD, the Plaintiff has presented no further evidence of unfavorable treatment or that such treatment would not have occurred but for Plaintiff's race or national origin.  Without more, the Plaintiff cannot support a claim for hostile work environment under the NJLAD.

Therefore, the court will grant Maxim's motion for summary judgment as to Plaintiff's NJLAD claim.

33

### C.  COBRA Claim

The Plaintiff also alleges Maxim violated COBRA's notice provision by failing to notify him within thirty days of his termination that he could extend his health benefits under COBRA. The Defendant argues that summary judgment is appropriate as to Plaintiff's COBRA claim because it is undisputed that the Plaintiff was not enrolled in Maxim's healthcare plan at the time of his termination.  The Plaintiff argues that an issue of fact exists which prevents summary judgment.  Specifically, the Plaintiff testified that he had applied for benefits approximately one month prior to his termination and as a result, the question of whether he was enrolled in Maxim's healthcare plan is an issue of fact for the jury.  The court disagrees with Plaintiff's argument and will grant the Defendant's motion for summary judgment.

29 U.S.C. § 1166(a)(1) provides that "the group health plan shall provide, at the time of commencement of coverage under the plan, written notice to each covered employee and spouse of the employee (if any) of the rights provided under this subsection." COBRA defines "covered employee" as "an individual who is (or was) provided coverage under a group health plan by virtue of the performance of services by the individual for 1 or more persons maintaining the plan."  29 U.S.C. § 1167(2).

Here, the Plaintiff was never provided coverage under

34

Maxim's group healthcare plan.  There is no protection provided under the statute for employees whose application for healthcare coverage was pending at the time of their termination and the Plaintiff has provided no authority to the contrary. Consequently, taking Plaintiff's deposition testimony as true, he would still not be considered a covered employee under COBRA entitled to notice because he was never in fact provided coverage by Maxim's healthcare plan.  Plaintiff admitted this fact in his answer to Maxim's request for "any and all documents concerning Plaintiff's entitlement to coverage under COBRA."  (Def.'s Reply Ex. G, Plaintiff's Responses to Defendant's Demand for Production of Documents, ¶ 22.)  The Plaintiff responded by stating: "None. Plaintiff did not have medical coverage or other benefits with Defendant."  Id.

Therefore, as Plaintiff was not a covered employee under COBRA, he was not entitled to notice of benefits when he was terminated.  Accordingly, Plaintiff's claim against Maxim under COBRA fails as a matter of law and summary judgment will be granted.

### D.  John Doe Defendants

Finally, Maxim moves for summary judgment as to Count III of Plaintiff's complaint against fictitious John Doe Decision makers and John Doe Owners and Operators for negligence, carelessness, recklessness and/or intentional conduct which caused him to

35

suffer violations of the NJLAD.  The Plaintiff has not opposed this motion for summary judgment and has not moved to name these fictitious parties.

The court has determined <u>supra</u> that Plaintiff has not established a violation under the NJLAD.  Consequently, any claims against these fictitious defendants for causing a violation of the NJLAD is without merit.  Further, "it is clear that, if after a reasonable period of discovery a plaintiff has not identified the fictitious defendant, the court may dismiss the fictitious defendant." <u>Martin v. Comunale</u>, No. 03-CV-06793, 2006 WL 208645 (E.D. Pa. January 18, 2006)(citing <u>Agresta v. City of Philadelphia</u>, 694 F. Supp. 117 (E.D. Pa. 1988)).  Discovery is complete in the instant case and Plaintiff has failed to identify the names of the fictitious defendants in Count III.  Therefore, Maxim's motion for summary judgment as to Count III of Plaintiff's complaint will be granted.

**IV.  CONCLUSION**

For the reasons discussed above, the court will grant the Defendant's motion for summary judgment.  The Plaintiff has failed to adduce evidence from which a reasonable jury could find in his favor under the NJLAD.  In addition, the Plaintiff was not entitled to notice of healthcare coverage under COBRA because he was not a covered employee at the time of his termination.  Finally, the Plaintiff did not oppose summary judgment as to the

36

claims against the fictitious John Doe defendants and the Plaintiff has failed to name these fictitious parties despite the completion of discovery.  Therefore, summary judgment is appropriate and the accompanying Order will be entered.


**December 12, 2012**                  **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                             Chief U.S. District Judge